Hunt, J.
This is one of those unfortunate family controversies that inevitably arise when aged parents in their last days, either by will or deed, give all their property to one or more of their children to the exclusion of others. It 'is true that the parents have. a technical legal right so to do, and the right thereby to bequeath to their children, smarting under real or fancied injustice, such embittering litigation as will permanently change from attraction to repulsion the influence of those ties of blood *89 for which, the parents .alone are responsible. Such instruments are usually executed by parents whose lives by age or other causes are no longer in touch with the varying phases of life, but run in narrow grooves of their own or others’ malting. Such parents, while exacting from their children a rigid compliance with the commandment “Honor thy father and mother,” forget and ignore that equally sacred and supplementary injunction, “Provoke not thy children to wrath. ’ ’
A violation of one of these commandments-, no matter how slight, leads to a violation of the other, and unless the parties have a broad minded sense of justice and some forgiveness of spirit, leads to results wholly out of proportion to the causes and to conditions' which can only be explained by attributing them to unbalanced reason, or a mind so clouded by causeless or undue resentment, that influences which would otherwise' work naturally and justly have undue weight in the formation of purpose. Men and women of sound judgment in the ordinary affairs of life, when they forget the mutuality of the obligation of .blood ties under the influence of real or fancied violation of such obligation, seem incapable of using such judgment. Under such influence s-uch obligations are viewed only as unilateral, unreasonable performance expected, and non-performance unreasonably resented.
Such mental condition, although not amounting to technical .unsoundness of mind, can not be ignored in considering the relative force of any influence which may be operative toward the commission of an act such as the making of a gift, deed or will, and in the solution of the question as to whether an influence is honestly and fairly exercised. When an influence operating upon a mind blinded by unreasonable resentment has part in the creation of a purpose wholly out of proportion to what such influence should have if judgment were not so affected, it would be an undue influence, especially if in the permissive or active exercise of such influence facts are misrepresented or concealed, which except for such misrepresentation or concealment would have a tendency to materially allay such resentment and permit -good judgment to assume control.
Human nature is so constituted that , in childhood and in old age,, especially in cases of-physical or mental infirmity, exactions *90 are frequently made upon the care and consideration of others, especially relatives, not onty with no thought of present pecuniary consideration therefor, but with quick and unreasonable resentment of the propriety of such consideration, even when possible and proper, is suggested. These facts can not be ignored and are frequently determining factors in the decision of the question as to whether an act or purpose is the result of undue influence or of an influenc.e unduly exercised. When an influence is accompanied by concealment or misrepresentation, active or passive in its exércise, it is unduly exercised and makes the influence undue. Like fraud generally, such influence can rarely be established by direct testimony, but when established by inference from circumstances which permit of no reasonable inference, except of such undue influence, it has in law been established by clear and convincing evidence. Undue influence is relative, depending upon all of the circumstances of the case. No one of such circumstances may be the controlling factor. All must be considered, even circumstances apparently trivial may be of assistance in determining the relative force of an influence.
The present action is brought by two sons, John and William Beyer, to .set aside the deed made by the father, John Beyer, Sr., a few months before he died, conveying a house and lot, being all of his real estate and practically all of his estate, to a third son, Frank Beyer, with whom he had been living for sometime prior to his death. It is claimed that the father at the time was weak in body and mind, that the deed was the result of undue influence unduly exercised, that the father at the time did not understand what he was doing or the force and effect of his act, and supposed he was executing a will instead of a deed.
The evidence, as in almost all of such cases, 'was voluminous. The property in question is worth about $5,000. The lot had been bought in 1895, and placed in the name of John Beyer, Sr., and Annie Beyer, his wife. Shortly thereafter a house was built thereon and a mortgage for $2,500 given to a building association. The Beyer family lived in the lower floor of the house and rented out the second floor for about $15 a month. At that time, to-wit, in 1895, the father was a foreman in the Herring-Hall-Marvin Safe Company. The son John, then twenty-six *91 years of age, was employed under Ills father. He had married in 1892, and was not living with his father. Frank and William, aged respectively at that time twenty-four and twenty-two. were employed elsewhere, and were unmarried and living at home. The whole family were thrifty, industrious Germans. Frank married in September, 1895, and William in May, 1901.
The father lost his permanent position with the safe company sometime in the year 1904, on account of a growing irregularity in his habits due to drinking. All of the boys, so long as they were unmarried, had turned their earnings over to their mother, until she died in February, 1900. From that time until May, 1901, when William married, the father and William lived with Frank and his wife in the lower floor of the house, William rooming with his father, both paying Frank board and Frank paying the father six dollars a month rent. On William marrying in May, 1901, Frank and his wife moved out at the request of the father, and William and his wife with the father occupied the lower floor, William paying the father six dollars a month rent. This continued until November, 1904, when William and his wife moved out at the father’s request, and Frank and his wife moved in. The-father had paid no board to William and his wife, and while there is some controversy as to the meals and attention given by William and his wife to the father, there is no evidence that during that time he ate to any appreciable extent elsewhere, or was not properly cared for, considering the fact that Frank’s wife was assisting her husband in conducting a tailor shop located some distance from the home.
The father was not a drunkard, but like many men of his nationality drank beer regularly and liked a social hour during the day or in the evening spent in one or more of the neighboring-saloons, several of which he regularly frequented, and sometimes, but not frequently, overstepped the line of sobriety.
Much has been made of the refusal of William and his wife to admit the father into the house one night in the summer of 3904, when he returned probably after one of such social hours and after William and his wife had gone to bed. The father did not seem to treat this very seriously at the time. He was not penniless, and rooms attached to a neighboring saloon had been voluntarily and without necessity used by him for a night’s *92 lodging, so that if he chose to sleep that night in an out-house, it must have been due to his condition. He worked occasionally at his trade. He received $21 a month rent, and $8 per month pension. He paid nothing for board or the care of his room.
. During the time that William and his wife lived in the house, the $2,500 to the building -association ivas finally paid off and on March 11, 1902, was canceled, so that when they left the property in November, 1904, the property was free from debt. During all this time John lived in Hamilton, Ohio, and while the father was holding his permanent position in the safe company in Hamilton, he sometimes made his home with his son John, until John’s wife marched or threatened to march him out' of some saloon. While William and his wife lived in the father’s house, the father did not visit or have anything to do with Frank and his wife, until the fall of 1903, when he began to visit Frank. His talks with Frank and his wife as to his life with William, resulted in the course of a year in his concluding that he was badly treated by William and his wife, in which conclusion Frank and his wife expressed their entire -agreement. The father accordingty in November, 1904, notified William to vacate and had Frank and his wife move into the house. This arrangement lasted until the deeding of the property to Frank on May 27, 1908, and until the father’s death on August 24, 1908. Frank claims that until this deed he paid six dollars a month rent and received nothing for his father’s board and other necessary attention.
Although the mother died in February, 1900, owning a half interest in the property, no talk or suggestion, notwithstanding the family difficulties, was made by any one as to the sons’ right in the property. The father was permitted to collect all the rents and to act as though he was the sole owner. The debts upon the property had been paid for more than two years before William and his wife moved out, but within two months after Frank and his wife returned the father, although in undisturbed possession of the property and -all its rents, began to be concerned as to the undivided interest which he was enjoying but which he did not own. There was no sale or mortgage necessary or contemplated to induce such concern. John and William had not asked for anything in regard to the property., but *93 on February 3, 3905, the father was appointed administrator of his wife’s estate, and on January 25, 3905, he signed a petition for the partition of the property prepared by Mr. C. A. Heilker, and on the same day Frank indorsed on the petition a' waiver of summons. The petition was filed on February 5, 1905, and John and William and their wives, in due course of time were duly served with summons.
About the time of this service John and William received letters from Mr. Pleilker with a view to a settlement for their interests in the property. Plaving never asked for their interest in the property, they at first said they preferred, to leave' things as they were, but being told by Mr. Heilker that they would be compelled to accept their share, they employed Mr. Horstman, and through the attorneys an agreement was finally made by which John and William were each to be paid $275 for their interest, and William’s wife was to be paid $100 for nursing the father while with her and sick with rheumatism. There is no evidence of such claim for nursing having been made until the partition suit was brought, nor is there any evidence that the claim was not a proper claim. There is some evidence that while William lived in the house the father was told that he should pay board. . • '
In pursuance of such settlement, John and William deeded their .interest to their father on April 30, 1906, and. the partition suit was dismissed on May 4, 1906. Frank had conveyed his interest to his father by a deed dated February 17, 1906, and on May 3, 1906, when said deed, was recorded, he received from his father a note for $275, which is unpaid.
In order to obtain the money necessary to pay John and William and William’s wife, the father executed a mortgage to Mary Humler on April 30, 1906, for $1,000. The father was caused to believe that all this was necessary because John, and William had demanded their interests in the property, which was not a fact, all .of which Frank undoubtedly knew. Subsequently, the father made two wills, one drawn by Mr. Heilker and one by Mr. 'Speiser, both German speaking attorneys, about six months apart, in which he devised all the.estate to Frank. Both wills were destroyed by the father as unsatisfactory, the last being destroyed after the deed in question to Frank was made. •
*94 On May 27th, 1909, about six months after the making of the last will, the father made the deed in question conveying the property to Frank, reciting in the deed that it was in consideration of the grantor being permitted to retain one room in the house and in consideration of his maintenance during his life by Frank and the payment of funeral expenses. In the deed it was provided that, if Frank failed to carry out any of such considerations, the conveyance was to be forfeited and the title reinvested at the request of the grantor, and further that the conveyance was made under and by virtue of the express conditions and the request of the grantee, to which he therebj’- agreed by accepting said conveyance. Notwithstanding such conveyance the father continued to receive the rent from the property, the only difference between his former position being that Frank did not pay rent, no board having been paid by the father either before or after the conveyance.
The deed was drawn up by Mr. .Werner, another German speaking lawyer, to whom as such lawyer the father was taken by Dr. Heck, a former family physician, at the request of the father. Mr. Werner prepared the deed with the conditions therein suggested by the father, and although Mr. Werner explained it to the father, the father after paying for it took it to Dr. Heck to have it explained again in both German and English. The night before the deed was made Frank says that his father told him what he was going to do, but Frank did not go or offer to go with him, and the night after the execution of the deed the father showed it to Frank, who paid the father the attorney fee and the cost of recording.
Thereupon the next morning the father took the deed to Dr. Heck and requested him to have it recorded. The father could not read English, except some of the words in daily use pertaining to his trade, and while he could read and write German, it was to such a limited extent that, if possible, during his whole life he used the sons or others to do so for him even in very-simple matters.
In the summer of 1908, Mary Humler wanted her money and notified the father, who did not refer her to Frank, but- made application himself to■ some of his friends and finally to a building association for the necessary loan. In each case he applied as the owner of the property. When the attorney of the build *95 ing association examined the title he found the deed and told the father that he did not own the property. The father expressed surprise. However, the building association on August 5, 1908, loaned upon the property $1,200 upon the father and Frank both signing the mortgage and- the cheeks for the loans. After satisfying the prior mortgage there was a balance of about $190, which the father deposited to his own credit in the TVestern German Bank.
The father told some of his friends of his surprise in finding that he did not own the property and was advised to see a lawyer. He consulted Mr. Sehroeder, the building association lawyer, who on August 23, 1908, at the request of the father, wrote to Prank demanding a reconveyance of the property.
The next morning the father was found dead at the foot .of the steps in a neighboring saloon. Frank and his wife claimed to know nothing as to the father’s absence from the house that night. They said he had retired to his room in the front of the lower floor of the house about nine o’clock when they went to bed, and that he was then suffering with diarrhoea. The letter from Mr. Sehroeder was received by Frank the same morning that the father was found dead. Frank and his wife claimed that at no time did the father, although living with them, express to them or indicate in any way any dissatisfaction or surprise as to his discovery of the effect of the deed; that they never even suggested the making of a will or deed, and that all the time they lived together harmoniously, but having no communications whatever with the other two sons or their families. There is some evidence as to wordy quarrels between the father and Frank or his family, but such evidence is indefinite as to the extent, the cause or the time of such words.
While the father lived with Frank, not only were all the steps taken to cut out the interests of John and William in the property, but such steps were taken without any cause attributable to John and William, although the father was caused to erroneously believe that they were demanding their shares in the property. During this time the father was caused to believe that he had lost his permanent position with the safe company by reason of his son, John, who had succeeded to his position, when in fact he had lost it by reason of his own irregular habits, • Dui' *96 ing this time the conduct of his son William and his.wife, while he had lived with them, seemed to trouble him more than it had done at the time ho actually lived with them. All of his real and fancied troubles, with John and William were talked over with Prank and his wife, and although some of such troubles were manifestly not due to John and William, Prank and his wife according to' their own testimony frequently expressed unconditional agreements with the father and fanned the flame of the growing resentment of the' father to John and William. Neither by word or act did Prank attempt .to correct any of the erroneous ideas of the father, although he must have known -that such ideas were erroneous.
The principles- of law attributable to this case are simple. The controversy is as to their application:
The foregoing are some of the salient facts in the. case. There are ■ others almost trivial in their nature, but which considered with the salient facts clearly and convincingly establish that John Beyer, Sr., although understanding that he was not making a will, did not understand the force and effect of the deed which he made; that considering the character of his- mind, his likes and dislikes, his natural and legal obligations, his concepton and misconception of facts, he was unduly influenced to make such deed and that such influence! was largely exercised, actively and passively, by his son Prank and his; wife, and that such deed should therefore be set aside.
Inasmuch, however, as.the consideration of such deed was the care and attention to be given to the father by Prank, and the funeral expenses to be paid by Prank, and it was manifestly the intent of the father, in malting such deed to compensate Prank for the care and attention given him during the time that he lived with Prank, a court of equity in setting aside such deed should recognize such consideration to the extent that it has been paid, and -in setting aside the deed a lien upon the property should be given to Prank for his unpaid note of $275 as- a vendor’s lien, and for all funeral expenses paid as well as a reasonably liberal amount -for the care and attention given by Prank to his father during four years preceding his death, whieh amount, if counsel .can not or do' not attempt to agree .upon, will be determined by the court upon evidence already submitted.